**Dwayne RHOINEY, Appellant–Defendant,**

v.

**STATE of Indiana, Appellee–Plaintiff.**

**No. 49A05–1007–PC–482.**

Court of Appeals of Indiana.

Dec. 30, 2010.

Rehearing Denied March 7, 2011.

Susan K. Carpenter, Public Defender of Indiana, Jonathan O. Chenoweth, Deputy Public Defender, Indianapolis, IN, Attorneys for Appellant.

Gregory F. Zoeller, Attorney General of Indiana, Richard C. Webster, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

## OPINION

RILEY, Judge.

### STATEMENT OF THE CASE

Appellant–Petitioner, Dwayne Rhoiney (Rhoiney), appeals the post-conviction court's denial of his petition for post-conviction relief.

We reverse and remand for resentencing.

### ISSUE

Rhoiney raises two issues on appeal, which we consolidate and restate as the following issue: Whether Rhoiney's appellate counsel was ineffective when she failed to raise the imposition of consecutive sentences as an issue in his direct appeal.

### FACTS AND PROCEDURAL HISTORY

We adopt this court's statement of facts as set forth in our memorandum opinion issued in Rhoiney's direct appeal, *Rhoiney v. State,* No. 49A02–0602–CR–119, 2006 WL 3525357 (Ind.Ct.App. Dec. 8, 2006), *trans. denied:*

On the evening of September 18, 2004, Rhoiney and an unidentified companion drove to [Gary] Wemer's house where Wemer and his cousin Charles Cook were unloading plywood. Cook, Rhoiney, and Rhoiney's companion got into an argument over money Rhoiney believed Cook had stolen some months earlier. Rhoiney threatened to kill Cook. Rhoiney's companion had a gun. Rhoiney threatened to kill Cook's girlfriend[,] Victoria Newland, and then Rhoiney and his companion left.

Cook called Newland to warn her and tell her Wemer's girlfriend, Alicha Walton, was coming to pick her up. When Walton started to drive away from Wemer's house, she saw Rhoiney walking toward the house with a gun. Because her child was in the house, Walton flashed her headlights at Rhoiney to attract his attention. He walked over to her vehicle, pointed a gun at her, and threatened her. She told him Cook had returned to his own house and he left. Walton then went back inside and told

Cook and Wemer that Rhoiney was on his way to Cook and Newland's house. The men left for Newland's house in separate vehicles and by separate routes.

Newland was on the porch when Wemer arrived. Wemer got out of the car and told Newland to get in because he was taking her back to his house. Rhoiney and his companion pulled up as Newland reached Wemer's vehicle. Rhoiney got out of the car with a gun and asked Wemer if he knew where the money was. Wemer said he did not. Rhoiney told Wemer to stop or he would shoot. Wemer stopped. Wemer and Rhoiney were face-to-face and about five or six feet apart. Newland testified:

> Some lights came up the road, and [Rhoiney] looked at Gary Wemer, and the trigger went off on the gun. And then he got in the car. After he shot Gary, he turned around and looked at me and acted kind of frantic, got in the car and rushed off.

Cook arrived as Rhoiney sped off. Wemer later died of a gunshot wound to the stomach. Newland identified Rhoiney as the person who shot Wemer.

On November 23, 2005, the State filed an Information charging Rhoiney with Count I, murder, a felony, Ind.Code § 35–42–1–1; Count II, criminal confinement, a Class B felony, I.C. § 35–42–3–3; and Count III, carrying a handgun without a license, a Class A misdemeanor, I.C. § 35–47–2–1. On December 21, 2005, a jury found Rhoiney guilty on all charges. On January 20, 2006, after a sentencing hearing, the trial court sentenced Rhoiney to fifty-five years for murder, ten years for criminal confinement, and one year for carrying a handgun without a license, with sentences to be served consecutively.

Rhoiney filed a direct appeal, claiming that the State had failed to present evi-dence that supported his murder conviction beyond a reasonable doubt. On December 8, 2006, we issued our memo-randum conviction, affirming Rhoiney's murder conviction. The supreme court subsequently denied transfer.

On March 2, 2009, Rhoiney filed his verified petition for post-conviction relief, which he later amended. On February 19, 2010, the post-conviction court held an evi-dentiary hearing. On June 23, 2010, the post-conviction court entered findings of fact and conclusions of law, denying Rhoi-ney's petition for post-conviction relief.

Rhoiney now appeals. Additional facts will be provided as necessary.

## DISCUSSION AND DECISION

### I. *Standard of Review*

Under the rules of post-convic-tion relief, the petitioner must establish the grounds for relief by a preponderance of the evidence. Ind. Post–Conviction Rule 1, § 5; *Strowmatt v. State*, 779 N.E.2d 971, 974–75 (Ind.Ct.App.2002). To succeed on appeal from the denial of relief, the post-conviction petitioner must show that the evidence is without conflict and leads unerringly and unmistakably to a conclusion opposite that reached by the post-conviction court. *Id.* at 975. The purpose of post-conviction relief is not to provide a substitute for direct appeal, but to provide a means for raising issues not known or available to the defendant at the time of the original appeal. *Id.* If an issue was available on direct appeal but not liti-gated, it is waived. *Id.*

### II. *Ineffectiveness of Counsel*

Rhoiney contends that his appellate counsel rendered ineffective assistance. Specifically, he claims that appellate coun-sel's conduct was defective when she failed to raise the imposition of consecutive sen-

tences as an issue on direct appeal. A defendant claiming a violation of the right to effective assistance of counsel must establish the two components set forth in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). First, the defendant must show that counsel's performance was deficient. *Id.* at 687, 104 S.Ct. 2052. This requires a showing that counsel's representation fell below an objective standard of reasonableness, and that the errors were so serious that they resulted in a denial of the right to counsel guaranteed the defendant by the Sixth Amendment. *Id.* Second, the defendant must show that the deficient performance prejudiced the defense. *Id.* To establish prejudice, a defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Id.* at 694, 104 S.Ct. 2052. A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Id.*

■ Counsel is afforded considerable discretion in choosing strategy and tactics and we will accord those decisions deference. *Timberlake v. State*, 753 N.E.2d 591, 603 (Ind.2001), *reh'g denied, cert. denied*, 537 U.S. 839, 123 S.Ct. 162, 154 L.Ed.2d 61 (2002). A strong presumption arises that counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment. *Id.* The *Strickland* Court recognized that even the finest, most experienced criminal defense attorneys may not agree on the ideal strategy or the most effective way to represent a client. *Id.* Isolated mistakes, poor strategy, inexperience, and instances of bad judgment do not necessarily render representation ineffective. *Id.* The two prongs of the *Strickland* test are separate and independent inquiries. *Id.* Thus, "[i]f it is easier to dispose

of an ineffectiveness claim on the ground of lack of sufficient prejudice ... that course should be followed." *Id.* (quoting *Strickland*, 466 U.S. at 697, 104 S.Ct. 2052).

■ The standard by which we review claims of ineffective assistance of appellate counsel is the same standard applicable to claims of trial counsel ineffectiveness. *Wright v. State*, 881 N.E.2d 1018, 1022 (Ind.Ct.App.2008), *reh'g denied, trans. denied.* In *Bieghler*, our supreme court identified three categories of appellate counsel ineffectiveness claims, including: (1) denial of access to an appeal; (2) waiver of issues; and (3) failure to present issues well. *Bieghler v. State*, 690 N.E.2d 188, 193–95 (Ind.1997), *reh'g denied, cert. denied*, 525 U.S. 1021, 119 S.Ct. 550, 142 L.Ed.2d 457 (1998). Rhoiney's claim is reviewed as a *Bieghler* type two issue. Our supreme court has noted several times the need for a reviewing court to be deferential to appellate counsel on this issue:

> [T]he reviewing court should be particularly sensitive to the need for separating the wheat from the chaff in appellate advocacy, and should not find deficient performance when counsel's choice of some issues over others was reasonable in light of the facts of the case and the precedent available to counsel when that choice was made.

*Id.* at 194. *See also Timberlake*, 753 N.E.2d at 605. In evaluating these claims, we use the following two part test: (1) whether the unraised issues are significant and obvious from the face of the record; and (2) whether the unraised issues are clearly stronger than the raised issues. *Bieghler*, 690 N.E.2d at 194. Otherwise stated, to prevail on a claim of ineffective assistance of appellate counsel, a defendant must show from the information available in the trial record or otherwise

known to appellate counsel that appellate counsel failed to present a significant and obvious issue and that this failure cannot be explained by any reasonably strategy. *Ben–Yisrayl v. State*, 738 N.E.2d 253, 260–61 (Ind.2000), *reh'g denied, cert. denied*, 534 U.S. 1164, 122 S.Ct. 1178, 152 L.Ed.2d 120 (2002).

### III. *Consecutive Sentence*

■ With respect to the trial court's imposition of consecutive sentences, Rhoiney asserts that because the presumptive sentence[1] was imposed, the aggravating and mitigating factors were equally weighted and with the absence of other aggravating circumstances, the trial court had no basis to order consecutive sentences. Thus, Rhoiney asserts that his appellate counsel's performance was defective when she failed to raise this issue.

■ The imposition of consecutive sentences is within the trial court's discretion. I.C. § 35–50–1–2(c). In order to impose consecutive sentences, the trial court must find at least one aggravating circumstance. *Marcum v. State*, 725 N.E.2d 852, 864 (Ind.2000), *reh'g denied*. The same aggravating circumstance may be used to both enhance a sentence and justify consecutive terms. *Id.* When the trial court deviates from the presumptive sentence or imposes consecutive sentences where not required by Statute, it must clearly state its rationale for doing so. *Harris v. State*, 749 N.E.2d 57, 60 (Ind.Ct. App.2001), *trans. denied*.

Here, the trial court sentenced Rhoiney to the presumptive fifty-five year sentence for murder, the presumptive ten year sentence for criminal confinement, and the presumptive one year sentence for carrying a handgun without a license. The trial court ordered the sentences to be served consecutively. When imposing the sentence, the trial court considered the following:

I would consider as mitigating circumstances if you want to consider the age, I'm not sure that's a factor but [Rhoiney] is a young person. He appears on his statements to be somewhat well spoken. He seems to rationalize some things, he seems to talk properly. He does lack some education. He had a friend, [ ], testify on his own behalf, a person who has a professional status in this community and he said he thought [Rhoiney] had some obviously good qualities which is even more difficult to try to rationalize what happened here. So, [Rhoiney] does have some good qualities. The [c]ourt would notice, mitigating circumstances, the fact that he apologized to the victim's family now. I suppose he could not have apologized but he did. [W]hether he's sincere or not, I don't know. I would have to say that he appears sincere today. Criminal history as a mitigator/aggravator, he has a number of arrests which the [c]ourt can consider. He has very few convictions. That whole record I look at, it just kind of marginalized. The history from Wisconsin reflects, I think, it said unknown, so it was a juvenile record. How they handle their juvenile matters there I don't know, but I would say in light of what we see in these courts sometimes, the record is not bad, it's nothing to brag about but it's not a bad

---

1. The facts in the instant case occurred on September 18, 2004, prior to the amendment of Indiana's sentencing statute which became effective on April 25, 2005. *See* P.L. 71–20058, § 9 (eff.Apr.25, 2005). Because we have held that the change from presumptive sentences to advisory sentences should not be applied retroactively, we will apply the earlier presumptive sentencing scheme when addressing Rhoiney's sentence. *See Hightower v. State*, 866 N.E.2d 356, 370 (Ind.Ct.App. 2007), *trans. denied*.

criminal history. I didn't see many charges, you know, of violence in there which, again, leads the [c]ourt to try to figure out what went wrong, what happened here. Why did this attack take place? You know, I can't explain that. From an aggravating standpoint, there's probably nothing more aggravating than the loss of a family member and the grief that's felt by survivors and this family is obviously, [ ], in a state of grief and will probably be so, for some of them, the rest of their lives. I'm sure they'll get on with this. There's a child out there to raise and I assume the family will see that that's done properly. Reflecting back on role models, I don't know. I made a note that [the State] said something about you know there are murders on TV and they're found to be wrong. Some of the TV I watch anymore, which is more limited anymore on a daily basis, I see some conduct on there that doesn't seem to be portrayed as being wrong. I don't know what's going on out there. It's kind of a sorry world in my opinion. Role models, certainly, that's important for some people. I did see a series the other night about Abraham Lincoln. Here's a man that was, [ ], raised virtually by himself. His mother died when he was very young. There were reports that his father may have abused him. He had deaths in the family. I think his sister died when he was young and he kind of raised himself and bec[a]me a great man. Certainly role models are important but they're not an indispensable quality, [ ], you have some set backs in life you work through it and try to get through it. That's about all I have to say, [ ], you just sit here thinking about this, trying to rationalize this and you just come up with ground zero, you can't do it. So, the [c]ourt on the [m]urder conviction is going to impose what we call the adviso-

ry sentence now, the fifty-five years. I'm not going to aggravate that and I think not so because of the reasons stated. On the [c]riminal [c]onfinement charge, the [c]ourt's going to impose, again, the advisory sentence of ten years and on the [c]arrying a [h]andgun charge, a Class A misdemeanor, a sentence of one year and the [c]ourt's going to order all those sentences served consecutive.

(Transcript pp. 521–24).

■■■■■ When the trial court exercises its discretionary authority to impose consecutive sentences, the trial court must enter, on the record, a statement that (1) identifies all of the significant mitigating and aggravating circumstances; (2) states the specific reason why each circumstance is considered to be mitigating or aggravating; and (3) shows that the court evaluated and balanced the mitigating circumstances against the aggravating circumstances and found that the aggravating circumstances offset the mitigating circumstances. *Diaz v. State*, 839 N.E.2d 1277, 1279 (Ind.Ct.App.2005). When a trial court finds that aggravating and mitigating circumstances are in equipoise, Indiana law provides that a defendant's sentences must run concurrently. *Id.*; *Wentz v. State*, 766 N.E.2d 351, 359 (Ind. 2002), *reh'g denied.*

Based on the trial court's sentencing statement, it is clear that the trial court found the aggravators and mitigators to be in balance and imposed presumptive sentences on all Counts but nevertheless then ordered the presumptive sentences to run consecutively, without identifying a specific aggravator to justify the consecutive sentences. The State now asserts that because the trial court mentioned Rhoiney's criminal history and the victim's impact statement as possible aggravators, the trial court could have relied on either of

these aggravators to run the presumptive sentences consecutively. We disagree.

With respect to Rhoiney's criminal history, the trial court obviously determined it to be of equal weight as an "aggravator/mitigator" and considered it "just kind of marginalized." (Tr. p. 522). The record reflects that while Rhoiney was placed in several group homes when he was a juvenile, his adult record only consists of a 2002 conviction for operating a vehicle without consent as a Class C misdemeanor, and a 2004 conviction for possession of marijuana, as a Class D felony. As we stated before, the significance of a criminal history varies based on the gravity, nature, and number of prior offenses as they relate to the current offense. *Neale v. State*, 826 N.E.2d 635, 639 (Ind.2005). Based on these guidelines, we cannot say that Rhoiney's criminal history can be characterized as an aggravator.

■ Turning to the victim's impact statement, we note that the trial court merely mentioned the grief felt by the survivors and the responsibility of the family to raise the victim's young son, without referencing any further specifics. When a trial court uses victim impact statements, the trial court must provide an explanation. *Davenport v. State*, 689 N.E.2d 1226, 1232 (Ind.1997), *clarified on other grounds*, 696 N.E.2d 870 (Ind.1998). Our supreme court explained that although the murder of a person carries with it an expected impact upon the family members and other acquaintances of the victim, this impact is accounted for in the presumptive sentence for murder. *Id.* at 1232–33. Therefore, in order to validly use victim impact evidence, the trial court must explain why the impact in the case at hand exceeds that which is normally associated with the crime. *Id.* at 1233. In the present case, the trial court provided no such explanation and as such, the victim's impact statement cannot be used as an aggravator.

As a result, we find that based on the record and the case law available at the time of Rhoiney's sentencing, appellate counsel should have recognized the trial court's imposition of consecutive sentences in the absence of any available aggravators as a significant and obvious issue; her failure to raise this issue cannot be explained by any reasonable strategy. *See Ben–Yisrayl*, 738 N.E.2d at 260–61. Therefore, we conclude that Rhoiney's appellate counsel's representation fell below an objective standard of reasonableness, and her error was so serious that it resulted in a denial of the right to counsel guaranteed to Rhoiney by the Sixth Amendment. This deficient performance prejudiced Rhoiney because there is more than a very reasonable probability that if the issue had been raised, Rhoiney's sentence would have been different. Therefore, we reverse the order of the post-conviction court and remand to that court for resentencing.

### CONCLUSION

Based on the foregoing, we conclude that the post-conviction court erred when it found that appellate counsel had provided Rhoiney effective assistance of counsel.

Reversed and remanded.

ROBB, J., and BROWN, J., concur.